IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division



ASHLEY JEAN ARNOLD,　　　　　　)
a/k/a Steven Roy Arnold,　　　)
　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　)　Civil Action No. 1:13-cv-900
　　　　v.　　　　　　　　　　　)　(LMB/TRJ)
　　　　　　　　　　　　　　　　)
ERIC D. WILSON, et al.,　　　　)
　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　　)
　　　　　　　　　　　　　　　　)

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

　　　PLAINTIFF ASHLEY JEAN ARNOLD, a/k/a Steven Roy Arnold, pro se,
hereby submits her reply to Defendants' motion to dismiss and for
summary judgment.  For the following reasons, Plaintiff respectfully
submits that this Honorable Court should deny Defendants' motions,
and order further proceedings in this matter.

INTRODUCTION

　　　At issue before the Court in this case is whether to grant
summary judgment and dismiss this civil action, in which Plaintiff
seeks redress for past, and continuing, violations of her constitutional
rights by Defendants, whom Plaintiff alleges have unlawfully deprived
her of medical treatment for her Gender Identity Disorder (GID),
also referred to as gender dysphoria.

　　　In a nutshell, Defendants say that they are entitled to judgment
on the current record, because one, the treatment provided to
Plaintiff is "consistent with the prison's security needs," and

thus cannot be deemed actionable; two, that Plaintiff's GID condition
is not serious enough to warrant consideration under the controlling
Fourth Circuit law; three, that, notwithstanding that Defendants'
treatment plan for Plaintiff violates internationally-accepted
medical standards for such patients, its years of delay in treatment,
derogatory comments made to Plaintiff, and other indignities cannot
be construed as "deliberate indifference" because its treatment of
her has now improved and protects the prison's security concerns;
four, that the individual capacity defendants had "little" involvement
in Plaintiff's case and "don't recall" her, thus immunizing them from
suit; and, five, that Plaintiff's right to treatment for her
condition was not "clearly established" at the time of the relevant
events in this case. <u>See</u> generally Defendants' Memorandum of Law in
Support of Defendants' Motion to Dismiss and for Summary Judgment
("Def. Mem.").

Respectfully, the Court should reject these arguments as
unpersuasive.

## ARGUMENT

1.  SUMMARY JUDGMENT MUST BE DENIED AS TO DEFENDANTS' CLAIM THAT
    ITS RECENT PROVISION OF TREATMENT RENDERS THIS MATTER MOOT
    AND THAT ITS DELAYS IN TREATMENT ARE NOT ACTIONABLE.

Plaintiff respectfully submits that the Court should deny
Defendants' request for summary judgment, to the extent that
Defendants rely on their assertion that their two-year delay in
providing hormone therapy is not actionable, and that their recent
decision to provide Plaintiff with such therapy and a bra renders
their official capacity moot.

2

Defendants are wrong, as a matter of law. Plaintiff's official capacity claims survive as to the declaratory, compensatory, and punitive damages aspects of her claim. The two years of deprivation of care is indeed actionable. "[M]ere delay or interference can be sufficient to constitute a violation of the Eighth Amendment." Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009). Where a plaintiff alleges an unconstitutional delay of medical care, the delay must result in "substantial harm." Shabazz v. Prison Health Serv., Inc., 3:10CV190, 2012 WL 442270, at *3 (E.D.Va., Feb. 9, 2012). Plaintiff's claims of pain and suffering, and the damages sought for it, remain alive before the Court, notwithstanding any cure of injunctive relief. Id.

As such, the Court should not find summary judgment appropriate in a finding of mootness for all official capacity allegations.[*]

Further, a reasonable jury could, in any event, find that injunctive relief is appropriate on the non-hormone requests for proper treatment, i.e., the Finasteride and makeup denials. While Defendants refer to Plaintiff's request for female attire as a complaint that she "is not allowed to cross dress to the extent she prefers," Def. Mem., at 12, this somewhat cavalier depiction of her request ignores a wealth of case law and professional medical literature that treats the "real-life experience" component of gender dysphoria treatment more seriously. Indeed, Defendants'

---

[*] Defendants' claim that it is "difficult to determine" whether Plaintiff seeks anything other than injunctive relief, Def. Mem., at 10, Plaintiff refers to the Prayers for Relief section of her complaint for clarification.

3

attitude on this aspect of treatment is perhaps indicative of the treatment Plaintiff has received for her GID condition.[*]

Notably absent from Defendants' Motion is any reference to the prevailing treatment guide for GID care: the World Professional Association for Transgender Health ("WPATH") Standards of Care (7th ed., 2011)(excerpts, attached as Exhibit A). See Soneeya v. Spencer, 851 F.Supp.2d 228, 231 (D. Mass. 2012)("The course of treatment generally followed in the community is governed by the [Standards]").

Defendants' failure to make reference to the Standards of Care is not surprising: the WPATH Standards not only call for treatment modalities Defendants refuse to provide to Plaintiff, but they are also well-respected -- and well-referenced -- in most court proceedings involving the treatment of GID patients. See, e.g., Soneeya, supra; De'Lonta v. Johnson, 708 F.3d 520, 523 (4th Cir. 2013); Kosilek v. Spencer, 889 F.Supp.2d 190, 196 (D.Mass. 2012); Fields v. Smith, 712 F.Supp.'2d 830 (E.D.Wis. 2010), aff'd, 653 F.3d 550 (7th Cir. 2011).

Instead of framing their arguments against the backdrop of the Standards of Care, Defendants point to a 2013 article in the Journal of the American Medical Association as authority. Def. Mot., at 3. This article, while certainly a credible commentary and care history of a transgender woman's treatment, appears to be one of the few (if any) instances in which it has been cited as a guiding protocol for GID care.

---

[*] Declaration of Ashley J. Arnold (Ex. L)(attached hereto), at ¶ 2.

4

Defendants' avoidance of the WPATH Standards of Care is understandable, because their actions simply do not comport with the triadic care set forth therein, which generally calls for (1) hormone therapy; (2) "real-life experience" in the desired gender role; and (3) sex reassignment surgery. See Exhibit A, at 9.

While some deviations from the protocol are to be expected, a reasonable jury could very well find that Defendants' lack of compliance with the WPATH Standards demonstrates deliberate indifference. Certainly, for purposes of the present proceedings, Defendants' categorical rejection of at least one, perhaps two, of the Standards creates a genuine issue of material fact as to Plaintiff's Eighth Amendment claims.

In order to establish that she has been subjected to cruel and unusual punishment, a prisoner must prove (1) that the deprivation of a basic human need -- like GID treatment -- was objectively sufficiently serious, and (2) that "subjectively the officials acted with a sufficiently culpable state of mind." De'Lonta v. Johnson, supra, 708 F.3d at 525. The Fourth Circuit has ruled that the denial of even some of the treatments recommended in the Standards of Care may be actionable. Id.

Defendants' refusal to offer Plaintiff any semblance of the Standards' real-life experience component is clear. Plaintiff's attempts to be treated as a female, as recommended by the Standards of Care, have been patently rejected by Defendants. Indeed, according to Plaintiff's declaration, Psychology staff have repeatedly approved of her request for makeup as a therapeutic tool, but that

Defendant Wilson's executive staff has each time denied the request for security-related reasons. Arnold Decl. (Ex. L), at ¶¶ 5, 11.

Notably, Defendant Wilson's categorical denial of makeup (and Finasteride) indicates no consideration of Plaintiff's therapeutic needs. And while Defendants' brief relies on the "rule" that such items "are not allowed in men's prisons," Def. Mot., at 29, this position is mere ipse dixit. There is no categorical rule in this regard. A prime example is Konitzer v. Frank, 711 F.Supp.2d 874 (E.D.Wis. 2010).

There, as here, prison officials argued that security concerns -- virtually identical to those cited by Defendant Wilson -- prohibited inmate Konitzer from having items that would assist her in participating in the "real-life experience" component of the Standards of Care. That court denied the prison's motion for summary judgment.

> [A]lthough a jury may well find that the defendants are justified in having a blanket policy that does not allow Konitzer to experience life as a female (through the use of modest makeup, womens' undergarments, female strip searches, facial hair remover, and being referred to as a female) in a male institution, in this regard the court cannot grant summary judgment. Taking the facts in Konitzer's favor, modest makeup, female undergarments, facial hair remover or growth items, and being referred to as a female are part of the real-life experience.

711 F.Supp.2d at 909.

Notably, the Konitzer court specifically rejected Defendant Wilson's "escape" rationale for denying Plaintiff's makeup. The court said, "a reasonable jury could find that this is a poor reason for denying Konitzer modest makeup. Again, Konitzer looks like a woman with or without the makeup; makeup may not change his appearance

6

much at all.  And [prison] staff are supposed to check the
identification of persons leaving the [prison]." Id., at 911.
Respectfully, the same applies here. While the courts are understandably
loathe to interfere in prison security matters, the "escape risk"
argument is as dubious here as it is in Konitzer.  The idea that
Plaintiff might waltz out the front door because she was wearing
eyeliner is simply fantasy.  As indicated in Plaintiff's declaration,
the security checkpoints at FCI Petersburg would make such an escape
attempt well-nigh impossible; no one is permitted to leave without
both identification in the hands of a staff member and an actual
escort by a staff member. Arnold Decl., at ¶ 20.  The Court should
reject Defendants' claim that makeup "could make it more difficult
to identify [prisoners'] facial features and verify who is an
inmate and who is not." Def. Mem., at 19.  Any officer so confused
by makeup should probably look for new work.  Inmates at FCI
Petersburg must wear prison issued clothing or items from a small
list in the commissary.  No such confusion is plausible.

As to the idea that there is an increased risk of sexual assault
if Plaintiff were permitted to wear makeup and other items that
would provide her with some measure of the Standards' "real-life
experience" prong, there is little credibility in the notion that
makeup might make Plaintiff an increased risk for sexual assualt.
Plaintiff already has breasts and wears a bra.  If Plaintiff is
going to be attacked, her breasts are probably a more likely predicate.
Cf. Konitzer, 711 F.Supp.2d at 910 ("Konitzer has breasts - bra or no
bra.").  Besides, Plaintiff has been wearing homemade makeup for
quite some time and has not been attacked. Arnold Decl., at ¶ 12.

7

Cf. Konitzer, 711 F.Supp.2d at 910 (no evidence of problem from prisoner's use of homemade makeup). See Kosilek, supra; 889 F.Supp.2d at 234 (many years of makeup use and "living as a woman" in male prison without incident).

Summary judgment is not appropriate for a ruling at this stage on the purported security concerns about "adversely affecting" sex offender treatment at FCI Petersburg, Def. Mem., at 19.  First, Defendant Wilson makes no effort to explain what effect Plaintiff's GID treatment might have on the treatment of sex offenders at the prison.  These unstated concerns should be viewed as an insufficient basis for dismissing this action.  It is the burden of the Defendants to offer some evidence of a connection between a policy and a plausible security concern. See Turner v. Safley, 482 U.S. 78, 100-01 (1987)(concern over disregard for prisoners' constitutional rights "whenever the warden produces a plausible concern").  Turner requires some objectively reasonable connection between a regulation and the legitimate concerns it purports to address.  No such evidence has been presented here.

Further, a reasonable jury could find that Defendant Wilson's concerns are pretextual.  Other courts and correctional officials have allowed the very same items that Plaintiff seeks -- and more -- to GID patients confined in sex offender treatment facilities. See, e.g., Battista v. Spencer, U.S. Dist. LEXIS 92010 (D.Mass. 2011) (allowing GID offender full complement of female items).

Summary judgment is reserved for cases in which there are no genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law.  A reasonable jury could find that Defendants' utter refusal to provide Plaintiff with treatment consistent with the Standards of Care constitutes a deliberate indifference to her serious medical need.  Simply because Defendants feel that the Standards need not be even considered -- let alone followed -- is enough to preclude summary judgment. Defendants have known about Plaintiff's serious medical need for years; they've ignored the only accepted treatment regimen, the WPATH Standards of Care, and even the opinion of their own psychologists who treat Plaintiff on a regular basis who have recommended real-life experience as a treatment; they've cited "security concerns" that are, on their face, not even plausible; and, as will be made apparent below, ignored their own medical records and their treatment of similarly-situated inmates in an attempt to gain summary judgment.  The Court should deny Defendants' motion on this basis.

2.   THE COURT SHOULD DENY SUMMARY JUDGMENT ON THE BASIS THAT
     DEFENDANTS' CLAIM THAT AN ENDOCRINOLOGIST CONSULT WAS
     "REQUIRED" IS CONTRADICTED BY THEIR TREATMENT OF OTHER
     SIMILARLY SITUATED INMATES.

The central pillar of the Defendants' claim that the delays

in providing treatment is that Plaintiff could not begin hormone

treatment because "gender dysphoric inmates, including [Plaintiff],

needed to be evaluated by an endocrinologist before obtaining any

hormone therapy." Def. Mem., at 5, citing Laybourn Decl., at ¶¶ 2-3.

While on its face, this cautious path sounds reasonable, it

does not stand up, primarily because it is not true.  FCI Petersburg

officials, including several of the same Defendants, have allowed

inmates to begin hormone therapy without an endocrinology consult.

In fact, they have actively refused to permit at least one inmate

to see an endocrinologist even after she began hormone therapy.

Annexed hereto is the declaration of Alicia Jade Brown, aka

Robert Floyd Brown, another FCI Petersburg inmate, who asserts that

she was prescribed hormone therapy by Defendants in 2012 -- without

first seeing an endocrinologist. See Declaration of Alicia Jade

Brown, aka Robert Floyd Brown ("Brown Decl.")(Ex. I), at ¶ 7.  Indeed,

Ms. Brown asserts that she has never seen an endocrinologist, and

that Defendants have routinely denied her requests to see such a

specialist concerning her hormone dosages. Id., ¶ 7.

Ms. Brown's declaration should be viewed as a fatal blow for

Defendants' summary judgment position, which is basically that

Defendants delayed providing hormone therapy for two years because

"[t]he undisputed record makes clear that the endocrinology

10

evaluation was medically necessary." Def. Mem., at 18.  Ms. Brown,

and another inmate, ▮▮▮▮▮▮▮, received hormones from Defendants

without an endocrinology consult.  In this regard, Defendants'

argument is, at worst, disingenuous; at best, it is insufficient for

summary judgment purposes.

Further, as to the medical necessity of an endocrinology consult,

it is hardly undisputed that a consult is an absolute requirement

before a patient can begin treatment.  As set forth in the Guidelines

and Protocols for Comprehensive Primary Health Care for Trans Clients,

produced by the Sherbourne Health Centre in Toronto (Exhibit K),

the very dilemma relied upon by Defendants -- that an endocrinologist

was not available -- is considered routine.

> [I]t is certainly reasonable to obtain the opinion of an
> endocrinologist or another more experienced physician
> about hormone regimens, in the case of a physician who
> feels he/she needs support.  However, in many areas of
> Ontario, access to endocrinologists is quite limited,
> and clients may thus have a prolonged waiting period.
> It may be helpful to the provider and client to consider
> starting on low-dose hormones (e.g. half the regular
> dosage) until the consultation can be obtained.

Id., at 9.

The point here is not to argue the relative merits of a

particular course of treatment, but rather, to emphasize that

virtually all of Defendants' "absolute" arguments fall flat in the

face of summary judgment.  A jury may very well find that Defendants'

did not violate Plaintiff's rights, but on the record before the

Court, they could so find, and that is all that matters. See

Thompson v. Shelton, 2013 U.S. App. LEXIS 19472 (4th Cir., 9/23/13)

(reversing district court's grant of summary judgment where prisoner's

version of the events plausible).

Defendants claim that they denied Plaintiff treatment for two years because an endocrinologist "must evaluate each gender-dysphoric patient to identify any adverse effects that might arise from a particular patient's hormone therapy and recommend any further evaluations needed before hormone therapy can be approved." Def. Mem., at 5.  Defendants Wilson, Lewis, and Vasquez-Velazquez were surely well aware that at least two inmates who'd never seen an endocrinologist were receiving hormone therapy while Plaintiff was denied it.  Accordingly,  summary judgment on this basis should be denied.

3.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS TO THEIR
     ASSERTION THAT PLAINTIFF'S GENDER DYSPHORIA IS NOT SUFFICIENTLY
     SERIOUS FOR EIGHTH AMENDMENT PURPOSES.

Defendants seek summary judgment on the basis that they were "not aware" of Plaintiff's serious  emotional distress, and that Plaintiff's "failure" to inform them of the same means there was no objective evidence of serious risk of harm from their lack of treatment for her GID. Def. Mem., at 11-12.  This "deficiency," Defendants claim, distinguishes this case from De'Lonta, supra, and other Eighth Emendment cases.

First, the Court should reject Defendants' claim that they are relieved of any Eighth Amendment liability because Plaintiff "does not allege, and there is no evidence to indicate that [she] told medical or mental-health staff about feeling hopeless, suicidal, or compelled to mutilate her genitals -- let alone that she provided prison officials any objective evidence of those problems." Def. Mem., at 16.

12

This allegation is flatly contradicted by Defendants' <u>own</u> records. (Exhibit E).  Records compiled by Plaintiff's primary mental health care provider, Dr. Andrea Weisman, Psy.D., are replete with references to these matters, and while counsel for Defendants has interviewed Dr. Weisman, Plaintiff has been advised that she will not be permitted to request an affidavit from Dr. Weisman due to Bureau of Prisons policy.* <u>See</u> Program Statement 3420.11, Standards of Employee Conduct, § 14.  These records include the following notations:

> Clinical Contact- January 27, 2012 (Weisman, A.):
>
>> Plaintiff's history of self-mutilation noted in record.
>
> Clinical Intervention- March 5, 2012 (Weisman, A.):
>
>> Plaintiff "has decreased the amount of times he physically harms himself by punching.  Over the past month, he has not done so at all."
>
> Clinical Intervention- March 5, 2013 (Weisman, A.):
>
>> Plaintiff's Treatment Plan
>>
>>> Note goals at 4: "Intense and increasing dislike of genitals."
>
> Clinical Intervention- March 7, 2013 (Weisman, A.):
>
>> Plaintiff discussed "lifelong struggle with being in a male body and the intense dislike of her genitals."
>
> Clinical Intervention- June 26, 2013 (Weisman, A.):
>
>> Plaintiff has "emotional discomfort for some time". Plaintiff "appeared down", "had thoughts of hitting herself, but has not done so in some time". Plaintiff has "a difficult time seeing something positive lately."

---

\* Plaintiff will attempt to obtain a statement or deposition from Dr. Weisman should the Court deem it necessary and appoint counsel to effect the procurement of such evidence.

Clinical Intervention- October 8, 2013 (Weisman, A.):

"This clinician suggested anti-depressants for the time being" to Plaintiff.
Plaintiff "reported hatred for her genitals and described just how much the existance of them bothers her."

Clinical Intervention- October 22, 2013 (Weisman, A.):

Plaintiff "continues to be enveloped by the sadness and depression."
Plainitff "described this time frame as 'watching my life crumble'".

Clinical Intervention- December 16, 2013 (Weisman, A.):

Plaintiff "should focus on eliminating self destructive ways."

Clincal Intervention- January 28, 2014 (Weisman, A.):

"We continue to work on the feelings about her hatred toward her genitalia."

Clinical Intervention- March 7, 2014 (Weisman, A.):

"Lows include self-loathing and disgust with male genitals."

Exhibit E.

As these treatment notes make clear, Defendants were indeed -- or should have been -- on notice that Plaintiff was suffering, badly. Thus, this Court should reject Defendants' assertion that there is no objective evidence that Defendants knew about Plaintiff's serious distress.[*]

Further, the Court should give no weight to Defendants' argument that says, in effect, because Plaintiff has not attempted to castrate herself while in BOP custody, her distress does not meet the Eighth Amendment rationale expressed in De'Lonta. See Def. Mem., at 14-15.

---

[*] Notably, Defendants make much ado about the counseling that Plaintiff has participated in as proof of their reasonable actions; surely, then, they were on notice of Plaintiff's distress.

14

(characterizing De'Lonta as being based primarily upon prisoner's self-castration history, "objectively more serious than it is here.").

Respectfully, the fact that Plaintiff has not yet maimed her own genitals is hardly proof of a person being free from serious distress for Eighth Amendment purposes. This argument is as much a loser as it is offensive; actual attempts -- or success -- at autocastration is not determinative in GID cases. Nor should it ever be. Putting this case in the context of Farmer v. Brennan, 511 U.S. 825 (1994), an authoritative decision on Eighth Amendment matters, "[o]ne does not have to await the consummation of threatened injury to obtain preventable relief." Id., at 845. Further, nothing in the De'Lonta cases focuses on autocastration as a litmus test in GID cases, as Defendants suggest. Indeed, De'Lonta v. Johnson, supra, should be read in more basic terms: "just because [prison officials] have provided De'Lonta with some treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with constitutionally adequate treatment." 708 F.3d at 526 (quoting De'Lonta v. Angelone, 330 F.3d 630, 635-36 (4th Cir. 2003)).

Later Fourth Circuit decisions have also not focused on De'Lonta's genitalia, but on the point that deliberate indifference can be shown where "the prison flatly refused to provide the inmate with a surgical procedure that was the single, remaining approved treatment for her documented 'debilitating' condition." E.g., King v. United States, 2013 U.S. App. LEXIS 15678, n.6 (4th Cir. 2013); Cosner v. Dodt, 2013 U.S. App. LEXIS 8756 (4th Cir. 2013)(citing De'Lonta v. Johnson,

15

for proposition that "even if Defendants provided 'some' treatment, it does not necessarily follow that Defendants provided 'constitutionally adequate treatment'").[*]

The same must be said here: Defendants are indeed providing Plaintiff with <u>some</u> treatment for her serious medical need, but have flatly refused to even consider -- let alone follow -- the internationally accepted Standards of Care in Plaintiff's case.

In sum, the Court should reject Defendants' attempt to persuade it that Plaintiff's condition is not objectively serious enough to warrant Eighth Amendment consideration.  Their claim that there is no evidence that they were aware of the facts is belied by their own records; their claim that their deprivation of care means nothing because Plaintiff has not injured her genitals is unworthy of consideration; and the relevant decisions are against them. Plaintiff has met her burden of demonstrating objective seriousness. Defendants' Motion for Summary Judgment on this basis should be denied.

---

[*] The Court should not be swayed by Defendants' collection of some extra-judicial authorities supporting their failure to treat Plaintiff's condition in an acceptable manner. <u>See</u> Def. Mem., at 15-16.  One case, from 1997, <u>Maggert v. Hanks</u>, 131 F.3d 670, 672 (7th Cir. 1997), has been all but eviscerated in later decisions. <u>See</u>, <u>e.g.</u>, <u>Fields v. Smith</u>, 653 F.3d 550, 556 (7th Cir. 2011)(discussing and rejecting <u>Maggert</u>'s rationale). Neither the Third Circuit case nor the Fifth Circuit one cited is of any utility either -- neither involved an actual case of GID to rule upon.  Neither carries any weight here.

4.   SUMMARY JUDGMENT MUST BE DENIED AS TO DEFENDANTS' REFUSAL
     TO CONSIDER PRESCRIBING FINASTERIDE.

There are genuine issues of material fact as to Defendants'
refusal to prescribe Finasteride to address Plaintiff's male pattern
baldness, and these disputes preclude summary judgment.

First, Defendants' claim that they have no obligation to even
consider Finasteride in Plaintiff's case because Finasteride is
simply a cosmetic drug that is not "medically necessary" in GID
cases, so, in essence, they cannot be deemed deliberately indifferent
to Plaintiff's needs for this drug. Def. Mem, at 20.  Second,
Defendants claim that they are absolved of responsibility on this
subject because Plaintiff only made a "single request" for such
treatment, and that there is "no record that [Plaintff] discussed
it with the endocrinologist." Id., at 21.  Both of these claims
fall flat for summary judgment purposes.

First, a reasonable jury could indeed find Defendants were
deliberately indifferent to Plaintiff's need for Finasteride.
While Dr. Laybourn claims no knowledge of Finasteride being used
as "first line" treatment in GID cases, the literature is replete
with such information.  In fact, even within the Defendants' own
exhibit, the JAMA article they point to as authoritative, Finasteride
is indeed listed as a first line treatment. See Defendants'
Exhibit 2, at 5 (table listing Finasteride among "Hormone Blocking
Drugs in Transgender Patients," used "for balding."); see id.
(describing Finasteride's medical effect).

Likewise, the Standards of Care also list 5-alpha reductase
inhibitors, like Finasteride, as "common anti-androgens" used in

17

regimens for feminizing hormone therapy. Plaintiff's Exhibit A, at 48.

Even if Dr. Laybourn and the other defendants somehow missed Finasteride in the common literature for treating patients like Plaintiff, they were on notice of its use in Plaintiff's administrative remedy papers.  While Defendants characterize Plaintiff's requests for Finasteride as a "single" one, she, in fact, asked for the drug repeatedly.

First, Defendants are wrong: Plaintiff began requesting Finasteride as early as January 5, 2013. See Exhibit M (BP-8, requesting Finasteride).  On January 14, 2013, she was informed in writing that "[h]ealth services staff state that there are currently no plans to add the drug Finasteride to your current treatment plan.  You may seek further remedy by submitting a BP-9." Id.

Plaintiff did pursue a BP-9 Administrative Remedy, in which she again noted her deep distress over her baldness.  On February 15, 2013,  that request was denied by Defendant Wilson himself. Citing BOP policy, Defendant Wilson wrote, "[a] prescription for male pattern baldness is for cosmetic purposes and not medically necessary.  Furthermore, you have no prior medical treatment or prescriptions for GID." Exhibit N.

Defendant Wilson's refusal to allow Finasteride in hand, Plaintiff reiterated her request for Finasteride to the Regional Director, and pointed out that she had been requesting GID treatment since 2011. Exhibit O.

On April 3, 2013, the Regional director denied Plaintiff's request for Finasteride, stating "the Warden's response thoroughly addresses the issue." Id.

Not deterred, on April 6, 2013, Plaintiff submitted her final administrative remedy, a BP-11, to the Central Office, headed by Defendant Samuels. Exhibit P.  That BP-11 was not answered until December 11, 2013, well after the filing of this civil action.*  There, Plaintiff was advised that a "decision regarding [her] request to be prescribed Finasteride" would be made after Plaintiff received her "follow-up evaluation" by the endocrinologist. Id. Exhibit P.

Now, of course, Defendants take Plaintiff to task for making only a "single request" for Finasteride, and -- after telling her that she would be made aware of their decision on her year-long request for Finasteride after she saw the endocrinologist again -- Defendants blame Plaintiff for not pressing the issue with the endocrinologist himself.

The Court should reject this duplicitious line of defense -- Plaintiff jumped through every hoop required, and Defendants' characterization of her actions as a "single request" should not be accepted by the Court.  Further, as indicated in Plaintiff's declarations, she states that she did in fact discuss Finasteride with both endocrinologists. Arnold Decl., at ¶ 9.  Given that

---

* BOP policy provides for an answer within 60 days, including extensions, for Central Office appeals. 28 C.F.R. § 542.18. Defendants waited until 6 months had passed to answer.

Plaintiff was not being seen for Finasteride, it is perhaps not surprising that these doctors did not discuss the matter in their reports. In any event, Defendants have not submitted affidavits from either endocrinologist, so their position is one based in speculation. Plaintiff's affidavit creates a genuine issue of material fact on this point, and Defendants' claims on this point are belied by the record, which shows Plaintiff's aggressive pursuit of Finasteride and consistent rejections by Defendants. See Sanders-El v. Spielman, 38 F.Supp.2d 438, 439 n. 1 (D.Md. 1999) (dispute between prisoner's averments and depiction of events in prison medical records creates material dispute: "the law must entertain the possibility that health care providers in a prison setting might bring certain biases to their occupation.").

Whether a reasonable jury would find deliberate indifference as to Defendants' refusal to consider prescribing Finasteride to Plaintiff is an open question. Accordingly, summary judgment should be denied on this point as well. Nothing raised by Defendants on this point withstands summary judgment scrutiny.

5.    SUMMARY JUDGMENT SHOULD BE DENIED AS TO DEFENDANTS' CLAIM
      THAT THEIR DUTY TO PROVIDE GID TREATMENT WAS NOT "CLEARLY
      ESTABLISHED"

According to Defendants, they cannot be held liable for violating Plaintiff's constitutional right to treatment because Plaintiff's right was "far from clearly established." Def. Mem., at 28. Defendants claim that from their viewpoint "at the time," they had no clearly established duties to provide the care that Plaintiff requested. Id. This argument should be rejected.

First, notwithstanding that Defendants' deprivations are ongoing, at most, Defendants' actions in this case date back only a year or two, in some cases, three or four. The questions as to qualified immunity in this case thus involve the legal climate in the last few years to determine whether their actions were "objectively reasonable," as assessed in light of the legal rules that were clearly established at the time they were taken. Anderson v. Creighton, 483 U.S. 635, 639 (1987).

Here in the Fourth Circuit, treatment for GID has been the law of the land since at least 2003, when the Fourth Circuit decided De'Lonta v. Angelone, supra. The duty to treat GID in accordance with the Standards of Care as the default measuring stick has been well-known since at least as long as most of the events in this case. As Defendant Lewis himself said in a 2012 meeting (or "webinar") with BOP staffers, the BOP knew it had to treat GID in a manner consistent with community standards even then. See Exhibit G (Federal Bureau of Prisons' Gender Identity Disorder webinar transcript, Apr. 23, 2012). As Defendant Lewis stated therein:

21

> Why are we treating this?
>
> The simple answer is that we have to.  There's a legal
> mandate from 1976 that we have a duty to treat . . .
> there have been many court cases reaffirming this . . .
> saying that we have to treat gender identity disorder.
> We do have a duty to treat it.

Id., at Slide 20.

Further, Defendant Lewis and his agency were -- contrary to

counsel's arguments -- fully aware that any treatment of GID must

be made pursuant to the WPATH Standards of Care:

> So on to what are the standards of care.  There aren't
> any other standards of care out there except for this
> one: The World Profesional Association for Transgendered
> Health, WPATH.  They used to be known by the old
> Benjamin Standards, and now they're called WPATH.  They
> are the only ones preparing standards of care so by
> default they are the ones that we go to.  That's again
> good and bad.
>
> The good is they really are putting a lot of work into
> transgendered health and putting together the standards
> of care for clinicians and for patients.  The bad is that
> they are also an advocacy group.  So a lot of times they
> are biased and they will look towards advancing their
> cause, sometimes more than helping what is in the best
> interest of the patient or the facility.  We have to
> think this is a prison setting; we have to do what is in
> the best interest of the taxpayers and the people at
> large as well.  So good and bad, they are the only ones
> out there so we should be reviewing the standards and
> applying them as best we can within the prison setting.
> They are the gold standard for gender identity disorder
> treatment at this time.

Id., at Slide 26 (emphasis supplied).

As Defendant Lewis is the Chief Psychiatrist for the entire

BOP, it should be beyond dispute that he, and his agency, understood

their "clearly established" obligations to treat patients like

Plaintiff pursuant to the Standards of Care.

Indeed, in 2012, in response to losing a suit on GID treatment, see Adams v. Federal Bureau of Prisons, 716 F.Supp.2d 107 (D. Mass 2010), the BOP decided that it had to change its Patient Care policy to comport with community standards.  Contrary to the assertions of the defendants in this case, the 2012 amended policy states:

> [c]urrent, accepted standards of care will be used as a reference for developing the treatment plan.  All appropriate treatment options prescribed for inmates with GID in currently accepted standards of care will be taken into consideration during evaluation by the appropriate medical and mental health care staff.

Program Statement 6031.03, Patient Care, at § 30.

The BOP's own policy in place at the time of many of the relevant events in this case even makes reference to "elements of real life experience." Id.

Simply put, Defendants' own admissions make it clear that they understood their clearly-established constitutional duty.  Summary judgment on this point should be denied as well.

6.   QUALIFIED IMMUNITY MUST BE DENIED AS TO THE INDIVIDUAL DEFENDANTS, BECAUSE THEIR FAILURE TO TRAIN AND FAILURE TO CARRY OUT CONSTITUTIONAL POLICIES AMOUNTS TO DELIBERATE INDIFFERENCE.

Defendants Samuels and Lewis assert that they are immune from suit because they have "little or no personal involvement" with the conduct that allegedly violated Plaintiff's constitutional rights. Def. Mem., at 24-26.  The Court should deny dismissal on this basis.

As indicated above, Defendant Lewis is the man responsible for training and policy for GID cases in the BOP.  Defendant Samuels is, obviously, the chief executive who is charged with authorizing official policy for the agency.

23

The fact that Defendant Lewis claims no recollection of Plaintiff's case means nothing here.  His personal involvement is established not through a theory of vicarious liability, but through his personal involvement in this case.  Defendant Samuels signed the 2012 policy upon which virtually all decisions were made.  Defendant Lewis was responsible for training and implementation of the policy.  Cf. Connick v. Thompson, 131 S.Ct. 1350, 1365 (2011) (liability may be established for failure to train).

As to Defendant Wilson, his personal involvement is even more readily discernable on the face of the complaint.  Defendant Wilson was advised that Finasteride is an accepted treatment in GID cases, see Exhibit H, excerpt from Transgendercare.com (indicating Finasteride use in GID cases, in conjunction with Spironolactone).  Defendant Wilson, personally, made the decision to deny Plaintiff items relating to her "real-life experience" needs.  His personal involvement is not debatable.  Summary judgment as to Defendant Wilson should be denied as well.

As to Defendant Vasquez-Velazquez, it matters not that he "doesn't recall" treating Plaintiff  -- he did, as Defendants' own records show. See Exhibit C, Medical Records (C-8: Defendant Vasquez-Velazquez's treatment notes as to Platinff's GID diagnosis).

Further, it also matters not that Defendants now claim that Defendant Vasquez-Velazquez had no power to do anything about Plaintiff's GID diagnosis.  This is patently false.  At no point have Defendants claimed that Defendant Vasquez-Velazquez's authority as an M.D. was superseded by the decisionmaking of others.  He

24

could have authorized hormone therapy for Plaintiff -- as he did
with Ms. Brown and ██ ████ -- but chose not to do so.  Because
both Plaintiff and Ms. Brown allege that Dr. Vasquez-Velazquez's
animosity toward GID treatment was apparent, a reasonable jury
could, indeed, find him liable.  Dismissal should thus be denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons, this Honorable Court should DENY Defendants' motion for summary judgment.

RESPECTFULLY SUBMITTED:

Ashley Jean Arnold
aka Steven Roy Arnold
Reg. No. 58434-083
FCI Petersburg, Box 1000
Petersburg, VA 23804

Dated: June 1, 2014

26

## CERTIFICATE OF SERVICE

I, Ashley Jean Arnold, aka Steven Roy Arnold, do hereby swear that I have caused to be served a true copy of the foregoing upon Mr. Benjamin T. Hickman, Special Assistant United States Attorney, 2100 Jamieson Avenue, Alexandria, VA 22314, via first-class U.S. Mail, on this 1st day of June, 2014.

Ashley Jean Arnold
aka Steven Roy Arnold