IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| **Ashley Jean Arnold** )<br>*Also Known As* **Steven Roy Arnold,** )<br>    **Plaintiff,** )<br>)<br>v. )<br>)<br>**Eric D. Wilson, et al.,** )<br>    **Defendants.** ) | 1:13cv900 (LMB/TRJ) |

MEMORANDUM OPINION

Ashley Jean Arnold, a federal inmate at Federal Correctional Institution Petersburg ("FCI Petersburg"), proceeding pro se, has filed this action pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), alleging that the defendants, Eric D. Wilson, warden of FCI Petersburg; Charles E. Samuels, Jr., Director of the Federal Bureau of Prisons ("BOP"); Dr. Jorge Vazquez-Velazquez, BOP medical doctor; and Dr. Donald Lewis, Chief Psychiatrist, have shown deliberate indifference to her serious medical needs by depriving her of treatment for her gender identity disorder ("GID").[1]  Each defendant is sued in his official and individual capacity.

On April 11, 2014, defendants filed a Motion to Dismiss and for Summary Judgment, accompanied by a supporting memorandum and exhibits.  See Dkt. No. 35, 36.  After being given the opportunity to file responsive materials in accordance with Roseboro v. Garrison, 528

---

[1] Arnold initially asserted a Fifth Amendment Equal Protection claim against defendant Vazquez-Velazquez.  In her opposition motion to the defendants' Motion to Dismiss and for Summary Judgment, she did not discuss this claim.  Therefore, the Court agrees with the defendants that plaintiff has abandoned this claim in this action.  See, e.g., Roberts v. Holder, 2009 WL 691212, at *5 (E.D. Va. March 13, 2009) (Brinkema, J.) (holding that failing to address a particular claim in a motion opposing summary judgment can be considered to be abandonment of the claim).

F.2d 309 (4th Cir. 1997) and Local Rule 7(K), plaintiff filed a response on June 10, 2014. See Dkt. No. 44 (Sealed), 56 (Redacted). Defendants filed a reply on June 20, 2014. See Dkt. No. 48, 57 (Redacted), 54 (Sealed). On September 18, 2014, plaintiff filed a "Motion for Leave to File Amended Complaint," in which she seeks to add Dr. Katherine Laybourn, Dr. Krystal Bailey, and Susan Rice as defendants; and to add new causes of action to the lawsuit. For the reasons that follow, the Court will grant defendants' Motion for Summary Judgment[2] and deny plaintiff's motion, without prejudice to her ability to file a new lawsuit against the new defendants, based on the new causes of action.

# I. Background

It is undisputed that plaintiff is a transgender woman. Although she was a born a biological male, she "has long considered herself to be female." Complaint ("Compl.") [Dkt. No. 1] ¶ 8. She is currently serving a 300-month term of imprisonment at FCI Petersburg, imposed after pleading guilty to production of child pornography. Id. ¶ 7. On March 23, 2012, a BOP psychologist diagnosed plaintiff as suffering from GID. Id. ¶ 11. According to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), GID, also known as "gender dysphoria," is a strong desire to be a member of the opposite sex, and a feeling that one actually is a member of the opposite sex. See id. ¶ 10; Memorandum of Law in Support of Defendants' Motion to Dismiss and for Summary Judgment ("Defs.' Mem.") [Dkt. No. 36], at 3 ¶ 2.[3] Many individuals with GID, including plaintiff, desire to transition from their birth gender to the gender that they feel they truly are. Such a transition is accomplished by a variety of

---

[2] Because the defendants rely on evidentiary support in their Motion to Dismiss and for Summary Judgment, it is appropriate to consider the motion as one for summary judgment under Fed. Rule Civ. P. 56, rather than as a motion to dismiss for failure to state a claim under Rule 12(b)(6).

[3] The defendants did not include page numbers on the exhibits attached to this memorandum. Accordingly, all page numbers referred to in citations to the exhibits refer to unnumbered pages.

2

different treatment methods, including real-life experience living as the other gender, hormone therapy, psychotherapy, and sex reassignment surgery. See Defs.' Mem., at 3 ¶ 3; Plaintiff's Response to Defendants' Motion to Dismiss and for Summary Judgment ("Pl.'s Resp.") [Dkt. 44] (Sealed) Ex. A7-A8.

In 2012, the BOP issued a program statement, 6031.01, explaining that inmates with GID would receive individualized treatment, tailored to the inmate's "life experiences prior to incarceration as well as experiences during incarceration." Defs. Mem. Ex. 3, at ¶ 30. To create an individualized treatment plan, the BOP considers "all appropriate treatment options . . . in currently accepted standards of care," including hormone therapy, "those elements of the real life experience consistent with the prison environment," and psychotherapy. Id. In order for an inmate with GID to obtain hormone therapy, an inmate must go through BOP's "non-formulary review process." See id.; see also Ex. 4 (Lewis Decl.) ¶¶ 5, 7. This process requires approval of the hormones by the institution pharmacist, the clinical director of the local facility, and the regional pharmacist. The prescription is then presented to the chief psychiatrist or medical director for final approval. See Lewis Decl. ¶ 6.

Since being diagnosed with GID, plaintiff has received psychotherapy on a regular basis, often monthly or bi-weekly. See, e.g., Pl.'s Resp. Ex. E5 (plaintiff discussed "meeting every other week" with her therapist "to address [negative emotions]"). In April 2012, shortly after plaintiff's initial GID diagnosis, FCI Petersburg's clinical director recommended that plaintiff receive several blood tests and a chest x-ray, in preparation for a visit with an endocrinologist and eventual hormone therapy. See Defs.' Mem., at 4 ¶ 7; Ex. 5, at 4. BOP's medical staff determined that inmates with GID, like plaintiff, should consult an endocrinologist before obtaining hormone therapy, due to the potentially serious physical side effects of hormone therapy.

3

See id. Ex. 6 (Laybourn Decl.) ¶ 3. Plaintiff disagrees with this assessment of medical necessity, and offers evidence that two other GID inmates received hormones without prior visits to an endocrinologist. See Pl.'s Resp., at 10-12; Ex. I (Brown Decl.). The defendants concede that two inmates were allowed to receive hormones without consulting an endocrinologist, but point out that, unlike plaintiff, those two inmates had been receiving hormone therapy for many years before their incarceration. See Defendants' Reply Memorandum in Support of Motion to Dismiss and for Summary Judgment ("Defs.' Reply") [Dkt. 54] (Sealed) Ex. 1 (Laybourn Supp. Decl.) ¶¶ 2, 3. For this reason, the defendants did not find that the other inmates needed to be evaluated by an endocrinologist before beginning hormone therapy. Id.

Plaintiff met with an endocrinologist at FMC Butner on March 5, 2013. Compl. ¶ 48. The endocrinologist recommended several tests, which plaintiff received in the following weeks. Defs.' Mem, at 7 ¶¶ 16-17. On January 27, 2014, plaintiff returned to Butner to meet with a new endocrinologist. Id. at 8 ¶ 18. On January 28, 2014, plaintiff was prescribed female hormones. See id. at 9 ¶ 20; Ex. 5, at 44-46. Defendants allege that the process of prescribing hormones to plaintiff took almost two years due to initial trouble finding an available endocrinologist. Because there was no endocrinologist on staff at FCI Petersburg, plaintiff had to first be evaluated at FMC Butner. Before she began receiving hormone treatment, plaintiff was referred to Butner for evaluation by a second endocrinologist. See, e.g., Defs.' Mem., at 5 ¶ 10-7 ¶ 16; 8 ¶¶ 18-19. Plaintiff alleges that the delay was actually caused by defendants' deliberate indifference to her medical needs. See, e.g., Pl.'s Resp., at 3.

Plaintiff also complains that she has not been allowed to wear makeup, possess female commissary products, and take Finasteride, an anti-androgen used to treat male pattern baldness, and has filed several grievances addressing these complaints. See Compl. ¶¶ 33-38, 42-47, 51,

58-59; Defs.' Mem. Ex. 11 (Wilson Decl.) ¶ 3; Ex. 12, at 3. Although defendant Wilson, the warden of FCI Petersburg, has allowed plaintiff to wear a sports bra, the BOP has denied all of plaintiff's other requests. See Wilson Decl. ¶ 13. FCI Petersburg, which houses an all-male population, does not allow inmates to purchase makeup. Id. ¶ 5. Citing security concerns, Wilson denied plaintiff's request for an exception to that rule, which applies to all inmates. See id. ¶¶ 8-11. Specifically, Wilson was concerned that allowing an inmate to wear makeup would make it easier for an inmate to escape. Id. ¶ 9. Wilson also had concerns about the unique atmosphere of FCI Petersburg, which has a large proportion of sex offenders among its inmates and administers a special sex offender management program. Wilson did not want to take "any risk–even a small risk–that could affect the integrity of the sex offender management program." Id. ¶ 10. Lastly, Wilson believed that, by presenting herself as feminine through the use of makeup, plaintiff put herself at an increased risk of sexual assault. Id. ¶ 11. BOP's central offices affirmed Wilson's decision. See Defs.' Mem., at 9 ¶ 22; Ex. 10, at 7-12.

In January of 2013, when plaintiff made her first request for Finasteride through the administrative grievance process, medical staff denied the request as not medically necessary. See Compl. ¶33; Defs.' Mem. Ex. 12; Laybourn Decl. ¶¶ 10-11. At the time, plaintiff's stated reason for requesting Finasteride was to treat her thinning hair. See Laybourn Decl. ¶ 10. BOP officials continued to deny plaintiff's administrative requests for Finasteride, finding that the drug was not medically necessary. See Defs.' Mem. Ex. 12. In later grievances, plaintiff asserted, as she does now, that the drug is actually medically necessary as part of her hormone therapy. See Pl.'s Resp., at 7-18, Ex. H4, Exs. N-P. In support, plaintiff offers a print-out from TransGenderCare.com, which lists Finasteride as one of several anti-androgens which "[have] been used for many years by endocrinologists as a biochemical means of controlling unwanted

hair growth in the genetic female." See id. Ex. H4. Anti-androgens are now widely used to treat transgendered women. Id. BOP officials have continued to deny plaintiff's request for Finasteride, finding that her treatment was adequate without the prescription. See Defs.' Mem. Ex. 12, at 17.

Plaintiff states that, because of the defendants' actions, she has suffered "great distress and anguish," has felt suicidal, and has attempted to mutilate her genitals. Compl. ¶¶ 68-70. She states that the lack of adequate treatment has left her in state "in-between" the male and female gender. Id. ¶ 71.

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the burden of proving that judgment on the pleadings is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (moving party bears the burden of persuasion on all relevant issues). To meet that burden, the moving party must demonstrate that no genuine issues of material fact are present for resolution. Id. at 322. Once a moving party has met its burden to show that it is entitled to judgment as a matter of law, the burden shifts to the nonmoving party to point out the specific facts which create disputed factual issues. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences from the facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Material facts are those facts for which the moving party bears the burden of proving. "[T]he substantive

law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Disputes over facts that do not ultimately affect a party's burden of proof on an element of a claim will not defeat a motion for summary judgment. An issue of material fact is genuine when, "the evidence . . . create[s] [a] fair doubt; wholly speculative assertions will not suffice." Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not defeat a properly-supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). Even where the nonmoving party is a pro se prisoner whose pleadings are entitled to liberal construction, a "declaration under oath . . . is not enough to defeat a motion for summary judgment. [The plaintiff] has to provide a basis for his statement. To hold otherwise would render motions for summary judgment a nullity." Campbell-El v. Dist. of Columbia, 874 F. Supp. 403, 406-07 (D.D.C. 1994).

### III. Analysis

In her claim for an alleged Eighth Amendment violation, plaintiff asks for both equitable relief against the defendants in their official capacities and monetary relief against the defendants in their individual capacities. As to those portions of the plaintiff's official-capacity claims that arise out of the alleged failure to provide her with hormones, the Court agrees with the

defendants that this claim is moot. Specifically, because it is undisputed that plaintiff is receiving hormone therapy, and there is no evidence that this treatment will cease, there is no further relief available under an official-capacity claim.

The Court also finds that plaintiff is not entitled to relief on her claim against the defendants in their individual capacities for how they handled her request for hormone therapy, or in their official and individual capacities for their denial of her request to wear makeup and take Finasteride, because there is no evidence in the record that defendants were deliberately indifferent to plaintiff's serious medical needs. Even if such evidence existed, the defendants are entitled to qualified immunity.

A.   Eighth Amendment Deliberate Indifference

To prove that a deprivation of medical care violates the Eighth Amendment's prohibition of cruel and unusual punishment, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Because "[t]he Constitution . . . does not mandate comfortable prisons," "only those deprivations denying the minimal civilized measures of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal citations and quotation marks omitted). Therefore, to prove that prison officials acted with deliberate indifference to a serious medical need, a plaintiff must prove both that officials deprived her of an objectively serious medical need, and that the officials acted with a subjectively culpable state of mind. See, e.g., De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). Officials only act with a sufficiently culpable state of mind if they display "deliberate indifference . . . by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), overruled in part on other grounds by Farmer v. Brennan, 511

U.S. 825 (1994). Neither a claim of medical malpractice nor a disagreement between the inmate and the prison about the proper way to treat a medical condition amounts to a violation of the Eighth Amendment. See, e.g., Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

Here, even though the parties agree that plaintiff suffers from a serious medical condition, see, e.g., Defs.' Mem., at 12-13, they disagree about the degree of severity of which defendants should have been aware. Plaintiff argues that defendants knew of her severe depression and suicidal ideations as a result of her distress over her GID, and that the defendants were deliberately indifferent to her rapidly-declining mental health. See Pl.'s Resp., at 13-14. Defendants argue that plaintiff did not fully express the extent of her depression, and that they therefore could not have been deliberately indifferent to her condition. See Defs.' Mem., at 12-16. These disagreements of fact are irrelevant to the summary judgment analysis, however, because the defendants have shown that they did not ignore plaintiff's GID, and that they did provide her with constitutionally adequate treatment.

Plaintiff focuses her claim of deliberate indifference on the failure of the defendants to treat her condition in strict compliance with the treatment plan laid out in the World Professional Association for Transgender Health Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("WPATH Standards"). See, e.g., Pl.'s Resp., at 5. Arguing that this treatment plan is "the model guide to the treatment of GID patients," Compl ¶ 12, plaintiff alleges that this plan is the only acceptable treatment for individuals with GID, and that by deviating from the WPATH standards, the defendants acted with deliberate indifference. See Pl.'s Resp., at 5. Such a conclusion is undermined by the WPATH Standards themselves, which specifically state that the recommendations "are flexible clinical guidelines," and can be adjusted based on "a patient's unique anatomic, social, or psychological situation." See Pl.'s Resp. Ex.

9

A5. In addition, the evidence shows that BOP officials knew of the WPATH Standards, and implemented the plan's recommendations into Program Statement 6031.03. See id. Ex. G7-G9, G10-G12. Given that the WPATH Standards acknowledge that treatment should be individualized and tailored to a specific individual's situation, BOP's flexible interpretation of the treatment standards does not constitute deliberate indifference. By treating plaintiff in accordance with the flexible guidelines of Program Statement 6301.03, the defendants provided plaintiff with constitutionally adequate treatment.

In addition, the defendants have shown that that the two-year delay in prescribing plaintiff with hormones was not the result of deliberate indifference. The evidence presented by the defendants shows multiple requests to locate an endocrinologist for plaintiff, multiple rounds of tests for the plaintiff, and continuing communication between the defendants and plaintiff's doctors. See, e.g., Defs.' Mem. Ex. 5; Ex. 9. Although the delay clearly caused plaintiff distress, see Pl.'s Resp. Ex. E1-E18, there is no evidence that the defendants showed reckless disregard for her medical needs. The defendants did not act with deliberate indifference simply because the plaintiff suffered some mental distress as a result of the delay. To show deliberate indifference, the defendants must have deliberately disregarded plaintiff's known medical issues. See, e.g., Farmer, 511 U.S. at 825. The medical and psychological records show that defendants were aware of plaintiff's concerns, and were working, albeit slower than she liked, to help her.

Lastly, although prisoners have a constitutional right to adequate health care, they do not have a constitutional right to the specific treatment of their choice, and officials are not required to give inmates "unqualified access to health care". Hudson v. McMillian, 503 U.S. 1, 9 (1992); see also Bowring v. Gordon, 551 F.2d 44, 48 (4th Cir. 1977). Prison officials must also balance the provision of medical care with the security and other institutional needs of the prison. Even

though plaintiff might not agree with Wilson's conclusions about the security risks arising from plaintiff's use of makeup or from medical staff's conclusions that Finasteride was not medically necessary, her disagreement is irrelevant to the analysis of whether defendants violated her Eighth Amendment rights. A disagreement between an inmate and prison officials about the provision of medical care, and the judgments underlying such decision, does not, on its own, mean that the officials showed deliberate indifference. See Wright, 766 F.2d at 849. Plaintiff states that the BOP did not fully address her administrative requests for Finasteride, and that the defendants have mischaracterized her efforts to obtain this drug. See, e.g., Pl.'s Resp., at 17-20. She states that the record, "which shows [her] aggressive pursuit of Finasteride and consistent rejections by Defendants," creates a genuine dispute of material fact on the defendants' deliberate indifference. Id. at 20. However, the record shows that, although plaintiff may not have been satisfied with the defendants' responses to her administrative requests for Finasteride, the defendants, by responding to her concerns and continuing to answer her grievances,[4] did not show deliberate indifference to plaintiff's needs. The disputed facts merely amount to a disagreement over the provision of medical care, and thus, do not preclude summary judgment.

In addition, "[considerations such as security] are peculiarly within the province and professional expertise of corrections officers, and . . . courts should ordinarily defer to their expert judgment in such matters." Pell v. Procunier, 417 U.S. 817, 827 (1974). Plaintiff disagrees with Wilson's security concerns, stating that "the idea that plaintiff might waltz out the front door because she was wearing eyeliner is simply fantasy." Pl.'s Resp., at 7. She also states that

---

[4] Plaintiff submitted her final administrative appeal, a BP-11 form, on April 6, 2013. The BP-11 was not returned until December 11, 2013, even though BOP policy mandates an answer within sixty days. See Pl.'s Resp., at 19. The defendants do not address this delay. See, e.g., Defs.' Mem. Ex. 12. To the extent that this delay is a disputed issue of fact, it has no effect on the outcome of this case, as the defendants' other evidence shows that they did not act with deliberate indifference.

11

Wilson's concerns that she could be at increased risk for sexual assault are unfounded, as she has been wearing homemade makeup for "quite some time." Id. Plaintiff therefore argues that the defendants have not provided any evidence that Wilson's policies were based on a plausible security threat, and that summary judgment should be denied on this point. See id. at 8. As the defendants explain, however, the institution's policies affect not only plaintiff, but all inmates at FCI Petersburg. The policies help to provide stability and ensure that correctional officers can effectively do their job. If plaintiff is allowed to change her appearance, other inmates may seek the same treatment, and security at the institution could deteriorate. See Defs.' Reply, at 17. As Wilson has presented a plausible explanation for his security concerns, the Court will defer to his expert judgment.

B.  Qualified Immunity

Defendants also argue that, even if they did violate plaintiff's Eighth Amendment rights, they are entitled to qualified immunity. Under the qualified immunity doctrine, defendants performing discretionary functions and sued in their individual capacity "are shielded from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A court considering a qualified immunity defense must make two inquiries: (1) whether the facts, when viewed in the light most favorable to the plaintiff, establish that the defendants committed a constitutional violation; and (2) whether such a right was clearly established at the time of the defendant's conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). A court does not need to address these inquiries in any particular order, and a defendant is entitled to qualified immunity if the court resolves either element in favor of the defendant. Pearson v. Callahan, 555 U.S. 223, 225 (2009).

Here, the defendants are entitled to qualified immunity on both elements of the Saucier test. For the reasons stated above, the defendants have not violated plaintiff's Eighth Amendment rights. In addition, the defendants have shown that they were not personally involved in the decisions and policies that caused a delay in plaintiff's medical treatment. A defendant can only be liable for a constitutional violation if his own individual actions violated the Constitution. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 675-76 (2009) (explaining that liability in a Bivens action cannot be premised on respondeat superior). The defendants have shown that they did not play a personal role in the decision-making process surrounding plaintiff's treatment. Plaintiff has named Wilson, Samuels, and Lewis as defendants merely because they denied administrative grievances or articulated BOP policies. She has not stated that any of these individuals actually took any action against her. See, e.g., Compl. ¶¶ 72-74 (asserting violations against all defendants for "repeated written denials of treatment," "refusal to answer Plaintiff's repeated requests for treatment," and "refusing to authorize treatments that are clearly warranted"); Pl.'s Resp., at 23 ("Defendant Lewis is the man responsible for training and policy cases in the BOP.") Samuels and Lewis do not work at FCI Petersburg, but at the BOP's Central Office in Washington, DC. See Defs.' Mem, at 24; Lewis Decl. ¶ 2. They therefore did not have any personal involvement in plaintiff's treatment, and thus cannot be liable to plaintiff.

Although Wilson denied plaintiff's grievances for makeup based on his concerns about security at FCI Petersburg, he had no personal interaction with plaintiff and had no specific involvement in the medical decisionmaking process. As Wilson's involvement in this case was limited to denying plaintiff's administrative grievances, he was not sufficiently personally involved in the case to be liable to plaintiff. Cf. Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (finding that defendant was not sufficiently personally involved in an allegedly

unconstitutional action when he received a letter from plaintiff); see also Alder v. Corr. Med. Servs., 73 F. App'x 839, 841 (6th Cir. 2003) ("The mere denial of a prisoner's grievance states no claim of constitutional dimension.").

Plaintiff did have more personal contact with defendant Vazquez-Velazquez, who met with plaintiff in October 2012 and allegedly made discriminatory comments towards plaintiff regarding her gender identity. See Pl.'s Resp. Ex. C8; Compl. ¶ 22. Those comments, however, had no impact on the BOP's decision to provide plaintiff with a specific type of treatment. In addition, Vazquez-Velazquez has shown that he did not have any personal involvement with the decision to provide plaintiff with hormone treatment or the decision to deny her makeup and Finasetride. The non-formulary medication process by which plaintiff obtained hormones requires multiple steps of review. Dr. Laybourn, acting clinical director, reviewed Vazquez-Velazquez's decision to prescribe a specific medication. Dr. Laybourn's decision was then reviewed by a higher-level official. See Laybourn Decl. ¶ 9. Regardless of Vazquez-Valezquez's views about the propriety of plaintiff's treatment, or the plaintiff herself, he had no impact on the BOP's ultimate decision regarding plaintiff's treatment. In addition, Vazquez-Velazquez is a physician consultant with the BOP, who is not assigned to any particular facility. He travels to many different facilities to assist medical staff, but does not provide long-term care to inmates. See Defs.' Mem. Ex. 13 (Vazquez-Velazquez Decl.) ¶ 1. His actions therefore could not determinatively affect the outcome of plaintiff's treatment.

Even if any defendant's conduct were a violation of plaintiff's Eighth Amendment rights, they did not have notice that the right violated was "clearly established." The threshold inquiry for determining whether a right was clearly established at the time of the defendants' conduct is whether "the contours of the right [were] sufficiently clear that a reasonable official would

14

understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Specifically, if individuals could reasonably disagree about whether a particular action was unconstitutional, a defendant is entitled to qualified immunity. See, e.g., Malley v. Briggs, 475 U.S. 225, 341 (1986). This is so because qualified immunity "ensures that [defendants] are liable only for transgressing bright lines," not for making "bad guesses in gray areas." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) (citing Anderson, 483 U.S. at 635). Determining whether a particular right is clearly established requires a contextual and particularized examination of the application of the constitutional provision to the specific facts in issue. See, e.g., Brosseau v. Haugen, 543 U.S. 194, 200 (2004); Saucier, 533 U.S. at 202.

Plaintiff asserts that "treatment for GID has been the law of the land since at least 2003, when the Fourth Circuit decided [De'Lonta]," thereby putting defendants on notice that they needed to provide her with treatment. Pl.'s Resp., at 21. Plaintiff then argues that because she had a right to treatment for GID, she had a right to treatment under the WPATH Standards of Care, and that defendants knew of this right. As explained above, this conclusion is incorrect. The right to treatment for GID is not commensurate with the right to a specific type of treatment. As the defendants pointed out in their reply memorandum, the Fourth Circuit's De'Lonta opinion did not mandate that prison officials rigidly follow the WPATH standards. Instead, the Fourth Circuit held that officials faced with the specific facts of De'Lonta's situation had not necessarily provided her with constitutionally adequate care. See De'Lonta, 330 F.3d at 636.

The plaintiff in De'Lonta had been receiving estrogen therapy in the custody of the Virginia Department of Corrections for two years when her treatment was "abruptly terminated" pursuant to a policy directive. Id. at 632. As a result of the abrupt termination of her hormone therapy, De'Lonta began to self-mutilate her genitals. Id. Addressing De'Lonta's situation, the

Fourth Circuit held that De'Lonta could overcome a motion for summary judgment by prison officials; however, the court "specifically [made] no comment on the type of treatment, if any, to which De'Lonta [was] entitled." Id. at 636. The Fourth Circuit did not announce a bright-line rule of constitutionally adequate treatment for GID. Moreover, different courts have come to differing decisions as to what treatment is constitutionally required for inmates with GID. Compare Kosilek v. Spencer, 889 F. Supp. 2d 190, 198 (D. Mass. 2012) (holding that the state Department of Corrections violated inmate's rights by not providing sex reassignment surgery), with Praylor v. Texas Dep't of Criminal Justice, 430 F.3d 1208, 1209 (5th Cir. 2005) (finding that the refusal to provide hormones to a transsexual inmate did not constitute deliberate indifference). To date, the United States Supreme Court has not provided a definitive answer to the question. Therefore, the contours of the right to medical treatment for GID are not clearly defined.

It is clear from this record that the defendants knew they had a legal obligation to treat plaintiff's GID, and have provided plaintiff with treatment in the form of hormone therapy and psychotherapy, and have allowed her to wear a sports bra. Accordingly, the defendants are entitled to qualified immunity.

### IV. Motion to Amend

On September 13, 2014, plaintiff filed a Motion for Leave to File an Amended Complaint, requesting permission to add three new defendants and several new factual allegations to this civil action. Dkt. No. 61. The defendants have opposed the motion. Dkt. No. 64.

In her amended complaint, plaintiff seeks to add as defendants Dr. Katherine Laybourn, acting clinical director of FCI Petersburg at the time of plaintiff's original complaint; Susan Rice, Drug Treatment Specialist at FCI Petersburg; and Dr. Krystal Bailey, Sex Offender Management Program specialist. See Plaintiff's Proposed Amended Complaint ("Am. Compl.") [Dkt. 61-1] ¶¶

6-8; Defendants' Memorandum in Opposition to Plaintiff's Motion to Amend ("Defs.' Opp. to Mot. to Amend") [Dkt. No. 64], at 4.[5] Plaintiff allegations as to Dr. Laybourn raise the same deliberate indifference to serious medical needs claims as have been discussed above. See, e.g., Defs.' Opp. to Mot. to Amend, at 10-14.[6] For the reasons discussed above, plaintiff's Motion to Amend will be denied. Because Laybourn was directly involved in all of the defendants' actions to provide plaintiff with medical care, her actions did not constitute deliberate indifference for the reasons identified in Part III.B., supra. Thus, it would be futile to allow plaintiff to add Laybourn as a defendant.

Against Rice and Bailey, plaintiff makes a new allegation of retaliation, claiming that both defendants filed false disciplinary reports against her, starting after she commenced this lawsuit. See, e.g., Am. Compl. ¶ 194 ("Until Defendants' action, plaintiff had never experienced any type of retaliation prior to filing her lawsuit. After 5 ½ years of clear conduct . . . , within a three week span of time Plaintiff received three incident reports and found herself heavily sanctioned and in the SHU."). In her proposed amended complaint, plaintiff also asserts Eighth Amendment claims against all defendants for failure to approve her requests for sex reassignment surgery, electrolysis, facial feminization surgery, voice therapy, and cup bras. See, e.g., Am. Compl. ¶¶ 188, 190-91.

Although Fed. R. Civ. P. 15(a)(2) provides that a district court should "freely give" leave to amend "when justice so requires," district courts have discretion as to whether to grant such leave. See Equal Rights Ctr. v. Niles Bolton Assocs., 602 F.3d 597, 602-03 (4th Cir. 2010). A court may

---

[5] The defendants did not include page numbers on the exhibits attached to this memorandum. Accordingly, all page numbers referred to in citations to the exhibits refer to unnumbered pages.

[6] Dr. Laybourn's significant role in plaintiff's GID treatment, as detailed in her affidavit attached to the defendants' Motion for Summary Judgment, do not change this conclusion. For example, Laybourn facilitated plaintiff's meeting with an endocrinologist at FMC Butner, and approved plaintiff's hormone prescriptions. See Defs.' Opp. to Mot. to Amend, at 4-5. Dr. Laybourn's conduct and treating decisions do not amount to deliberate indifference.

deny a motion to amend when, for example, the proposed amendment would be prejudicial to the opposing party, occurs after undue delay, or would be futile. Id. at 603. Importantly, if a newly asserted claim would change the character of the litigation, a court may deny a motion to amend. See Smith v. Angelone, 111 F.3d 1126, 1135 (4th Cir. 1997).

Plaintiff's proposed claims against defendants Rice and Bailey will be denied for several reasons. First, it appears that, at the time of the filing of her proposed amended complaint, plaintiff had not exhausted her administrative remedies. Plaintiff filed grievances regarding the disciplinary charges filed by Rice and Bailey. See Defs.' Opp. to Mot. to Amend Ex. 2, at 16; Ex. 3, at 5; Ex. 6, at 2. Wilson denied both grievances, and plaintiff appealed this decision to the Mid-Atlantic regional director. See id. Ex. 2, at 17-10; Ex. 3, at 6-7; Ex. 6, at 1. The Mid-Atlantic director's response was not yet due as of the date that plaintiff filed her amended complaint. See id. Ex. 2 at 20; Ex. 3 at 8; Ex. 6 at 4. Therefore, plaintiff had not yet exhausted her remedies before filing her amended complaint. The Court therefore cannot consider her allegations.

In addition, plaintiff's claims of retaliation would significantly change the character of this litigation, which focuses on whether BOP provided plaintiff with proper medical care for her GID. See, e.g., Compl. ¶ 6 ("This is a civil action involving the denial of treatment for a serious medical need."). If plaintiff wishes to pursue a claim for retaliation against Bailey and Rice, she must do so in a separate lawsuit after fully exhausting all administrative remedies.

Similarly, allowing plaintiff to add additional claims based on the denial of electrolysis, facial feminization surgery, voice therapy, cup bras, and sex reassignment surgery, would enlarge the scope of the litigation beyond what has already been fully developed in the record.

## V. Conclusion

For the foregoing reasons, plaintiff's Motion for Leave to File an Amended Complaint will be denied without prejudice, thereby allowing her to file a new civil action once she has properly exhausted her claim, and the defendants' Motion for Summary Judgment will be granted. An appropriate Order shall issue.

Entered this 23rd day of December 2014.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge